RONALD O. KAYE, SBN 145051
Email: rok@kmbllaw.com
CAITLIN S. WEISBERG, SBN 262779
Email: cweisberg@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Tel: (626) 844-7660
Fax: (626) 844-7670

Attorneys For Plaintiffs
ROBERT G. LINDSEY
CHARLES G. RODRIGUEZ

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT G. LINDSEY and CHARLES G. RODGRIGUEZ,<br><br>Plaintiffs,<br><br>vs.<br><br>PAUL TANAKA; KEVIN STENNIS; AND DOES 1-10, INCLUSIVE<br><br>Defendants. | CASE NO:<br><br>**CIVIL RIGHTS COMPLAINT FOR DAMAGES, ALLEGING:**<br><br>**(1) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983 – FOURTH AMENDMENT / DUE PROCESS / BRADY;**<br>**(2) DEPRIVATION OF CIVIL RIGHTS, 42. U.S.C. §1983 – SELECTIVE PROSECUTION / EQUAL PROTECTION.**<br><br>**DEMAND FOR JURY TRIAL** |

# I.

## SUMMARY OF ALLEGATIONS

1.     In August of 2011, the Los Angeles Sheriff's Department ("LASD") Internal Criminal Investigations Bureau ("ICIB") began a criminal investigation against Plaintiffs Robert G. Lindsey and Charles G. Rodriguez, LASD patrol deputies in good standing with the Department. The investigation stemmed from what ICIB personnel represented to be discrepancies between a video of an arrest which occurred on June 2, 2011 and Plaintiff Lindsey's June 3, 2011 arrest report. That report memorialized the arrest of "Abraham Rueda" for the possession of one quarter gram of cocaine. "Rueda," who later admitted under oath that his true name was Uriel Salgado ("Salgado"), was an undocumented immigrant living in Los Angeles who had used at minimum seven false names in criminal proceedings and had been convicted several times for controlled substance offenses.

2.     In truth and in fact, Plaintiff Lindsey truthfully summarized both the deputies' and Salgado's actions on June 2, 2011 in his police report. There were no false statements in that report.

3.     Upon information and belief, Defendant Paul Tanaka, then Undersheriff of the LASD, instigated the referral of Plaintiffs Lindsey and Rodriguez for prosecution. Plaintiffs Lindsey and Rodriguez were singled out based on Defendant Tanaka's personal animus, when other similarly situated officers accused of falsifying police reports were not investigated or referred for prosecution. Based exclusively on the pressure exerted by Defendant Tanaka, *and not* based on the evidence or the seriousness of the alleged offense, the Los Angeles County District Attorney's Office filed charges against Plaintiffs Lindsey and Rodriguez.

4.     Plaintiffs Lindsey and Rodriguez's preliminary hearing was set for February 14, 2014. Based on Salgado's failure to appear in Superior Court for the

preliminary hearing, the Superior Court dismissed the case against Plaintiffs. Without charges pending, and with marching orders from Defendant Tanka to pursue this politically motivated prosecution, Deputy District Attorney Kevin Stennis, serving in a non-prosecutorial function, began pursuing a means for Salgado to avoid deportation and legally remain in the United States. In furtherance of this goal and prior to the new preliminary hearing against Plaintiffs, Defendant Stennis – who at the time was pursuing a position as a Superior Court Judge in Los Angeles County – engaged in surreptitious negotiations with Salgado, in order to secure his testimony against the Plaintiffs. Specifically, Defendant Stennis promised to assist Salgado to obtain relief from deportation as a "victim" under the Victims of Trafficking and Violence Protection Act. Although Defendant Stennis' negotiation and promises of assistance to Salgado were explicitly and extensively memorialized in email communications between Defendant Stennis and Salgado's sister, Veronica Flores, this exculpatory evidence was deliberately withheld from Plaintiffs and the Superior Court. As a result, Plaintiffs and the Superior Court were deceived at the preliminary hearing in 2013, and Plaintiffs were bound over for trial. Moreover, this exculpatory information was withheld from Deputy District Attorney Gretchen Ford, who took over the prosecution of Plaintiffs once Defendant Stennis was appointed to the Superior Court.

5.     Defendant Stennis, who was not performing official prosecutorial functions when negotiating with Salgado to obtain legal immigration status in the United States, was aware that there was a lack of probable cause to charge Plaintiffs and deliberately and unconstitutionally withheld this crucial exculpatory evidence in order to achieve the political goal mandated by Defendant Tanaka to prosecute Plaintiffs.

6.     On information and belief, these efforts to initiate criminal charges against Plaintiffs were *not* motivated by legitimate law enforcement concerns or by the evidence, but rather were motivated by a personal grudge by then Undersheriff

2

Paul Tanaka against Plaintiff Lindsey's father – former Commander Robert Lindsey. In initiating this retaliatory act against Commander Lindsey's son, then Undersheriff Tanaka, set this unconstitutional chain of events in motion.

7.      On June 11, 2015 – four years after the legal arrest of Salgado and after the immigration negotiations with Salgado came to light during trial – a Los Angeles County jury acquitted Plaintiffs Lindsey and Rodriguez of all charges after three hours of deliberation. In the interim, Plaintiffs were taken off of patrol, deprived of their salaries, and, along with their families, suffered extraordinary humiliation and emotional distress.

## II.

## JURISDICTION AND VENUE

8.      This action is brought by Plaintiffs Robert G. Lindsey and Charles G. Rodriguez ("Plaintiffs") pursuant to 42 U.S.C. §1983.

9.      This Court has jurisdiction under 28 U.S.C. §1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §1983, and under 28 U.S.C. §1331.

10.   The acts and omissions complained of occurred within the Central District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

## III.

## PARTIES

11.    Plaintiff Robert G. Lindsey is a resident of the State of California and resided within the jurisdiction of the State of California at all times herein alleged.

12.    Plaintiff Charles G. Rodriguez is a resident of the State of California and resided within the jurisdiction of the State of California at all times herein alleged.

13.     At all times relevant herein, Defendant Kevin Stennis was employed by the Los Angeles County District Attorney's Office as a Deputy District Attorney, and resided within the jurisdiction of the State of California. Defendant Stennis is sued in his individual capacity.

14.     At all times relevant herein, Defendant Paul Tanaka, although employed by the Los Angeles County Sheriff's Department as Undersheriff for the Los Angeles County Sheriff's Department, acted outside of the scope of his authority with respect to the investigation of allegations of employee misconduct and referral for prosecution of Plaintiffs. Defendant Tanaka is sued in his individual capacity.

15.     Plaintiffs are informed and believe and thereon allege that Defendants sued herein as Does 1 through 10, inclusive, were engaged in the misconduct described above.  Plaintiffs allege that each Defendant named as a "Doe" was in some manner responsible for the acts and omissions alleged herein. Plaintiffs will ask leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

## IV.

## GENERAL ALLEGATIONS

16.      Each paragraph of this complaint is expressly incorporated into each cause of action which is a part of this Complaint.

17.     The acts and omissions of all Defendants were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Plaintiffs.

/ / /

/ / /

/ / /

/ / /

4

## V.

## FACTUAL ALLEGATIONS

### A. INITIAL ARREST AND CHARGING OF URIEL SALGADO AKA: "ABRAHAM RUEDA"

18.    On June 2, 2011, Plaintiffs Lindsey and Rodriguez, while on patrol as Los Angeles County Sheriff's deputies, received information from a confidential informant that a man named "Abraham" was trafficking in controlled substances at an establishment called the Durango Bar in Huntington Park, California. After encountering "Abraham" in the parking lot of the Durango Bar, Plaintiffs Lindsey and Rodriguez uncovered a plastic baggy containing one quarter gram of powder cocaine. Based on this discovery, Plaintiffs arrested "Abraham" who advised Plaintiffs that his name was "Abraham Rueda," for a violation of §11350(a) of the Health and Safety Code, Possession of a Controlled Substance (powder cocaine). "Abraham Rueda" has represented under oath that his true name was Uriel Salgado. Salgado has used seven other aliases, or "akas" when interacting with law enforcement in the United States. On June 2, 2011, Salgado, a citizen of Mexico, was undocumented and had no legal immigration status to remain in the United States.

19.    Salgado's preliminary hearing was set for August 18, 2011.  On that date, Salgado presented a video purportedly recorded on his cell phone to his public defender. Salgado represented that the video was a partial recording of the original surveillance video reflecting his arrest at the Durango Bar on June 2, 2011. Based on the purported alleged inconsistencies in the description of events depicted by Salgado's cell phone video as compared to Plaintiff Lindsey's Arrest Report, the Los Angeles County District Attorney's Office, through Deputy District Attorney Jeffrey K. Herring, dismissed Salgado's case. Neither Salgado nor the District Attorney's Office disputed that the small bindle of powder cocaine

5

seized by Plaintiffs Lindsey and Rodriguez was recovered in Salgado's vehicle as stated in Plaintiff Lindsey's Arrest Report.

20.   On August 18, 2011 – the same day as the dismissal of Salgado's criminal case – Los Angeles County Sheriff's Department's Internal Criminal Investigations Bureau ("ICIB") began an investigation of Plaintiffs. At that time, the Captain of ICIB was Captain William Carey, who reported directly to Undersheriff Paul Tanaka. On August 18th, ICIB Lieutenant Stephen Leavins instructed ICIB Sergeants Maricela Long and Scott Craig to obtain the original video purportedly recorded by Salgado from the Durango Bar.[1] Sergeants Long and Craig purportedly seized the Durango Bar computer where the original video of the June 2, 2011 incident was stored. ICIB represented that the original video of the June 2, 2011 had been erased and that there was no copy of the June 2, 2011 video. Only the purported partial recording of the surveillance video taken by Salgado on his cell phone remained.

21.   On information and belief, the genesis of the ICIB investigation against Plaintiffs Lindsey and Rodriguez by the Los Angeles County Sheriff's Department stemmed from then-Undersheriff Paul Tanaka's personal vendetta against Plaintiff

---

[1]   Los Angeles County Sheriff's Department Undersheriff Paul Tanaka, Captain William Carey, Lieutenant Stephen Leavins, Sergeant Maricela Long and Sergeant Scott Craig were charged in the United States District Court, Central District of California with, *inter alia,* Conspiracy to violate the Due Administration of Justice, and Obstruction of Justice in violation of 18 U.S.C. §§ 371, and 1503(a). This criminal conduct occurred at approximately the same time – August of 2011 – as the commencement of the investigation against Plaintiffs. *See United States v. Tanaka, et al.* CR 13-0255-PA and *United States v. Thompson, et al.*, CR 13-0819-PA. Specifically, other than Captain Carey who pled to 18 U.S.C. § 1623 – making a false statement under oath, each of these Sheriff's Department officials was convicted at trial with interfering and obstructing an investigation of the Federal Bureau of Investigation reflecting a pattern and practice of the use of excessive force against inmates at the Los Angeles County Jail.

Lindsey's father, Robert Lindsey, who was a commander in the Los Angeles County Sheriff's Department.

**B.   INVESTIGATION LEADING UP TO THE PRELIMINARY HEARING**

22.   In the fall of 2011, ICIB investigator Sergeant Daniel Tobin began interviewing witnesses in order to build a case against Plaintiffs Lindsey and Rodriguez. Based on the investigation, on November 1, 2011, Plaintiffs were removed from their status as LASD patrol officers, and relegated to dispatch / desk duty. Among the witnesses interviewed was Salgado, who, at that point, still falsely maintained to ICIB investigators that his name was Abraham Rueda. On November 18, 2011, ICIB investigators Sergeants Tobin and Matthews interviewed Salgado. That interview was audio-taped. However, during that interview, the ICIB investigators referenced that *another interview* had taken place at an earlier time. Contrary to ICIB policy, and contrary to every other interview performed by ICIB against Plaintiffs Lindsey and Rodriguez, that interview was *not recorded.* On information and belief, Salgado advised the ICIB investigators that he was undocumented and had no legal status to stay in the United States, and requested, in exchange for his assistance in the prosecution of Plaintiffs Lindsey and Rodriguez, that the LASD assist him in obtaining legal immigration status in the United States.

23.   On April 2, 2013, the District Attorney's Office filed a Felony Complaint against Plaintiffs Lindsey and Rodriguez, alleging multiple counts of Filing a False Report, a violation of Penal Code § 118.1, and Conspiracy to Commit a Crime, under Penal Code § 182(a)(1).  Representing the District Attorney's Office was Defendant Deputy District Attorney Kevin Stennis. Plaintiffs pled not guilty to these charges.

24.   A preliminary hearing was set to be held against Plaintiffs on February 14, 2014. Despite the fact that the District Attorney's Office subpoenaed Salgado,

he violated the subpoena and failed to appear at the hearing.  Based on Salgado's failure to appear, the Superior Court dismissed the charges against Plaintiffs.

25.   On information and belief, after the dismissal of the Felony Complaint against Plaintiffs, Defendant Deputy District Attorney Stennis acting in a non-prosecutorial capacity, either directly or indirectly through DOES 1-10 and with the assistance and/or encouragement of Defendant Tanaka, either directly or indirectly, developed a scheme to initiate charges against Plaintiffs. With no charges then pending against Plaintiffs, and acting outside of the judicial phase of the criminal process, Defendant Stennis spoke to Salgado and/or to Salgado's sister Veronica Flores and promised Salgado that he would assist him in applying for a visa through a Petition for U Nonimmigrant Status under the Victims of Trafficking and Violence Protection Act ("U Visa") in exchange for his testimony. To apply for a U Visa, an applicant must obtain a certification that he/she was a victim of a qualifying criminal activity. The certification can be provided by any agency that has responsibility for the detection, investigation, prosecution, or sentencing of the qualifying criminal activity, and is generally submitted by law enforcement.  In this case, with no prosecution pending, the initial steps were undertaken to clear the way for a new prosecution. A U Visa Certification – or Department of Homeland Security Form I-918 Supplement B – attests that Salgado:

      a.  was a victim of a qualifying crime;

      b.  suffered substantial physical and / or emotional harm as a result of the qualifying crime;

      c.  possesses information about the crime; and

      d.  was helpful, is being helpful, or is likely to be helpful in the investigation or prosecution of the crime.

26.     A crime victim must receive the signature of a government official verifying that the person was a victim of a qualifying crime and helpful to an investigation. Among others, a U Visa Certification can be executed by police officers, prosecutors, judges, and child protective services representatives; it *is not* an exclusive function of a prosecutor. The granting of a U Visa *is not* contingent upon the outcome of the law enforcement action for which the crime victim is providing assistance.

27.     After the dismissal of the original Felony Complaint, on March 3, 2014, Defendant Deputy District Attorney Stennis filed new charges against Plaintiffs. Defendant Stennis charged Plaintiffs with the same counts originally filed on April 2, 2013, but in this amended Felony Complaint, Defendant Stennis included a charge of Conspiracy to Commit an Act Injurious to Public, in violation of Penal Code § 182(a)(5), claiming that Plaintiffs conspired to pervert and obstruct justice.  The *sole purpose* of this new charge was to file a charge which would enable Salgado to qualify for the U Visa, the initial steps for which were taken before the new charges were filed.

## C.     PRELIMINARY HEARING AND PROMISE OF IMMIGRATION BENEFITS

28.     Plaintiffs' preliminary hearing on the amended Felony Complaint was set for May 23, 2014 in the Los Angeles Superior Court. On May 15, 2014, eight days prior to the preliminary hearing, the following email exchange occurred between Veronica Flores – Salgado's sister – and Defendant Stennis reflecting the application for a U Visa for Salgado:

- May 15, 2015 at 9:27 A.M. from Defendant Stennis to Veronica Flores: Working on it Veronica but it is a very long process and there will probably not be an answer any time soon based on my past experience

9

with the U visa process. Hope he is ok and I regret him having to be detained.

- <u>May 15, 2015 at 9:48 A.M. from Veronica Flores to Defendant Stennis</u>: . . . I know U visa is a very long process but hopefully you get the approval soon so when he is with immigration he show that to the judge and he might put a bail, for us to pay until his u visa is approve by the USCI offices.

- <u>May 15, 2015 at 11:03 A.M. from Defendant Stennis to Veronica Flores</u>: Veronica he is in custody on the immigration case. I can't let him go, he has to be returned to Adelanto [ICE custody] per law and the same deputies that picked him up have to take him back. His worker told me he will have to go before a judge and have a hearing and that could take a long time. I don't know that process but if he gets deported and comes back illegally, then I don't think I could get him the uvisa, but again I don't know immigration law. We also have to determine if the charges for this case qualify for U Visa. I won't know that until after the 23rd as I added a charge of "obstruction of justice" which I believe qualifies, but if that charge gets dismissed at the prelim on the 23rd, the remaining charges are not U visa eligible charges. I will do everything I can.

29.  On May 15, 2014 and May 20, 2014, prior to the commencement of the preliminary hearing, the following email exchange took place between ICIB Sergeant Tobin and Veronica Flores, Salgado's sister with regard to Salgado's application for a U Visa:

- <u>May 15, 2014 at 8:18 A.M., from Veronica Flores to Sergeant Tobin</u>: . . . I was just wondering if you have any updates on my case brother if he is going to be able to get the U visa sign by the attorney, I know court

is on May the 23rd and that after that he will be transfer to immigration facility . . .

- May 20, 2014 at 7:44 P.M. from Sergeant Tobin to Veronica Flores: Sorry it's taken so long to get back to you. I have been away at training. I don't know the status of the U-Visa application is yet. I will ask the lawyer about that on Friday. . . .

30.   Plaintiffs' preliminary hearing commenced on May 23, 2014. No information, including but not limited to copies of these email conversations between Veronica Flores, Defendant Stennis and ICIB Sergeant Tobin, pertaining to the District Attorney's Office's efforts to obtain a U Visa for Salgado, was ever produced to Plaintiffs in the discovery in the criminal case prior to the preliminary hearing.

31.   On May 27, 2014, 12 days after the email exchange between Defendant Stennis and Veronica Flores, and 7 days after the email exchange between Sergeant Tobin and Veronica Flores, criminal defense counsel for Plaintiff Lindsey engaged in the following examination of Salgado during the preliminary hearing:

> Q.   Mr. Salgado, did the District Attorney or Sergeant Tobin make any promise to you that they might help you in your immigration matter?
>
> A.   No, Never.

32.   Defendant Stennis and Sergeant Tobin were present at counsel table during this examination. Both Defendant Stennis and Sergeant Tobin were aware that the testimony provided by Salgado was false, but neither informed the Superior Court, nor Plaintiffs' criminal defense counsel that, in fact, efforts were being made to facilitate the U Visa application for Salgado.

33.   On May 27, 2014 and later on July 11, 2014, Sergeant Brandon Dean, Plaintiffs' supervisor on June 2, 2011, testified about his contact with Plaintiffs during the arrest of Salgado. Dean described his telephonic communication with

Plaintiffs from the Durango Bar with regard to Plaintiff Lindsey's plain sight observation of the bindle of cocaine in Salgado's vehicle, the arrest of Salgado, and Dean's instruction to Plaintiffs to seize Salgado's vehicle and transport the vehicle to Sheriff's station. Dean's testimony was consistent with Plaintiff Lindsey's June 3rd police report and corroborated Plaintiffs' position that Plaintiff Lindsay *did not* intentionally make any false statements in his police report.

34.   On June 19, 2014, in the middle of the preliminary hearing, Plaintiff Lindsey retained a new criminal defense attorney, Kasey L. Sirody, to defend him against the charges set out in the amended Felony Complaint. On that day, the following email exchange between Defendant Stennis and Salgado's sister, Veronica Flores, occurred:

- June 19, 2014 at 2:41 PM, Defendant Stennis to Veronica Flores:
  The new atty came in today and set it for July 11. Because I fussed to the judge about your brother, she is supposed to let me know by July 1 if she plans on recalling your brother (which I don't expect). If not, they will send me email that day and I will go to court, and get him released back to immigration on the 1st. After the 11th I will know if he qualifies for a u visa which will probably need to have him testify again "legally" . . . will let you know.

35.   Following the testimony of Sergeant Dean, in July of 2014, prior to the parties presenting their arguments at the preliminary hearing to the Superior Court, the following exchange occurred between Defendant Stennis and Salgado's sister, Veronica Flores:

- July 15, 2014 at 11:21 AM, Defendant Stennis to Veronica Flores:
  Veronica we finished the testimony today and I ordered the judge to order the Sheriff's to immediately send Uriel [Salgado] back to Adelanto.

We will argue the prelim in late august but I will start discussing the visa and future witness issues regarding Uriel with my superiors soon. . .

- July 15, 2014 at 1:17 PM, Veronica Flores to Defendant Stennis:
  I will let you guys know where he is going to be at, I hope you can get the form sign by you supervisor on regards the visa for my brother I believe he has 3 weeks once he gets there with immigration to see the judge and request for a bail but he needs to have the form fill out to show it to him. . .

- July 23, 2014 at 8:23 AM, Veronica Flores to Defendant Stennis:
  Any news with the U visa paperwork yet? My brother has court on the 30th of this month and we really need it so he can be able to show that to the judge..

- July 28, 2014 at 8:18 AM, Defendant Stennis to Veronica Flores:
  I will not know until 8/25 if the defendants will be held to answer on the one charge with is u visa eligible, "abuse of process." I then have to get permission from my head deputy to submit the u visa memo. What I recommend you do is let his atty there know that he is a witness and victim on this case, has been fully cooperative and would greatly benefit if he was allowed to stay. You can also give them my number and I can explain how cooperative Uriel has been. . .

- July 28, 2014 at 9:14 AM, Veronica Flores to Defendant Stennis:
  I haven't get any attorney yet for him because I don't have much money to pay one … I contacted this person at Esperanza immigration services is an nonprofit company that helps victims and low income people on they cases . .  But in order for them to get my brothers case I have to present them his convictions papers to them and also the paper sign for the U visa but since your telling me that you won't know until august

13

25th. Can I at least get a letter from you saying he is an important witness
and that he did cooperate with you?

- July 28, 2014 at 11:59 AM, Veronica Flores to Defendant Stennis:
  . . . On the present case if you can't get the letter then what can you get
  me? That's shows he is an important witness and that you guys kept him
  in custody for 4 months for him to testify?

- July 28, 2014 at 11:44 AM, Defendant Stennis to Veronica Flores:
  I personally can't do it because it will be considered "improper" on the
  present case and I would have to disclose it to the defense attorneys and a
  big problem would occur…..

- July 29, 2014 at 10:48 AM, Defendant Stennis to Veronica Flores:
  The problem with the uvisa is our office won't consider it until the case is
  over because we can't make it appear that we are doing it to gain favor
  for his testimony. . .

36.   On August 25, 2014, the Superior Court held Plaintiffs to Answer,
finding that there was sufficient evidence to demonstrate probable cause that
Plaintiffs committed the offenses charged in the amended Felony Complaint. No
evidence of the efforts to assist Salgado with his U Visa was disclosed to the Court
or to Plaintiffs' criminal defense counsel.

37.   On that day – August 25, 2014 – after the Superior Court's decision to
bind Plaintiffs over for trial, the following email exchange occurred between
Defendant Stennis and Veronica Flores:

- August 25, 2014 at 10:41 AM, Defendant Stennis to Veronica Flores:
  Both deputies were "Held to Answer" on all charges. Arraignment is sept
  8.

- August 25, 2014 at 11:36 AM, Veronica Flores to Defendant Stennis:

14

OMG my brother Has court on Thursday is there any way you can at least give us a formal letter to show the judge that he is waiting on this case and that he has cooperate with you guys?

- <u>August 25, 2014 at 1:01 PM, Defendant Stennis to Veronica Flores</u>:
  I can't do that as it would appear I'm seeking favor with a witness, get me in trouble and costs me a job. He can tell the judge and if they contact me as professionals, I can answer their questions honestly.

**D.    POST PRELIMINARY HEARING AND TRIAL**

38.    On or about October 23, 2014, Plaintiff Lindsey's defense attorney, Kasey Sirody, met with Defendant Stennis at his office to review discovery in Plaintiffs' criminal case. In an October 14, 2015 declaration sworn under the penalty of perjury, attorney Sirody stated:

At the above-mentioned meeting, we discussed the merits of the case and Stennis advised me that after the case was dismissed (it was dismissed and re-filed before the first preliminary hearing), his suggestion to his management was to not re-file the case based on lack of evidence. However, in Mr. Stennis' words, "someone from the Sheriff's Department came and had a meeting with my boss and I was told I **would** re-file the case."

(Emphasis in original.)

39.    On November 25, 2014, the Superior Court dismissed the Count 2 of the amended Felony Complaint against Plaintiff Rodriguez, holding that there was not probable cause to hold Defendant Rodriguez to Answer for making a false statement in the CHP 180 form.

40.   In April of 2015, Defendant Stennis was appointed as a judge to the Superior Court of Los Angeles County by the governor of California, Governor Jerry Brown. The District Attorney's Office's prosecution of Plaintiffs was taken over by Deputy District Attorney Gretchen Ford. Defendant Stennis *did not* present

15

the email conversations between Veronica Flores and himself to Deputy District Attorney Ford, and did not disclose information pertaining to the U Visa negotiation between Salgado and the District Attorney's Office. On June 1, 2015 the District Attorney's Office proceeded with the trial of Plaintiffs based on the charges set out in the amended Felony Complaint. At that juncture, Defendant Stennis was no longer employed by the District Attorney's Office, as he had been appointed to the bench of the Los Angeles County Superior Court.

41.   On June 1, 2015 – more than a year since Defendant Stennis communicated with Veronica Flores about Salgado's U Visa, during the cross-examination of Salgado - Plaintiff Lindsey's criminal trial attorney (Bradley Brunon) raised on cross-examination at trial the issue of Salgado receiving possible immigration benefits by the District Attorney's Office in order to halt Salgado's deportation.  The Superior Court advised Plaintiff Lindsey's attorney that the court had no information pertaining to immigration benefits, and the court did not want Plaintiff's criminal defense counsel to engage in a "fishing expedition" on the immigration issue.  In response to whether there was any discussion of immigration benefits presented to Salgado, the following exchange occurred between Plaintiff Lindsey's criminal defense attorney, the Superior Court, and Deputy District Attorney Gretchen Ford:

> Mr. Brunon: … I am entitled I believe to explore his [Salgado's] feelings as to whether or not the prosecution is benefiting him to remain in the country.

> Court: And the Court disagrees with you. I disagree with you. I think I need to understand the underpinnings . . .

> Mr. Brunon: How are we going to find that out is my –

> The Court: I'm hoping the People will give us that answer. Do you know the answer?

Ms. Ford: I have texted Mr. Stennis about it who would be willing to make the arrangements and my investigating officer [Sergeant Tobin] spoke with the sister [Veronica Flores] who is more conversant in English who apparently has a history concerning e-mails concerning her brother's deportation.

Mr. Brunon: Your Honor, I think it would be relevant to get those [emails] because it would certainly go into th[e] gentleman's expectation.

42.   Based on this exchange, Deputy District Attorney Ford represented to the Court that she was going to obtain the emails from Defendant Stennis reflecting immigration benefits pertaining to Salgado. This was the *first time* that Plaintiffs had any notice that there was communication between the District Attorney's Office and Salgado with regard to immigration benefits and deportation relief.

43.   On June 2, 2015, Veronica Flores produced multiple emails reflecting communications between herself and Defendant Stennis with regard to the U Visa. *See supra* ¶¶28-29, 34-35, 37. This was the *first time* that Plaintiffs received copies of any communication between the Defendant Stennis, Sergeant Tobin, and Veronica Flores – Salgado's representative – with regard to immigration benefits and deportation relief for Salgado. After disclosing these emails, Veronica Flores provided the following testimony outside the presence of the jury:

Q.   Were you communicating to him [Salgado] while he was in immigration custody that you were in contact with the D.A. and trying to get him some assistance.

A.   Of course. Because he wanted me to help him to get him out of immigration.

Q.   How do you know he wanted that?

A.   'Cause I go visit him to jail and to immigration detention center and he always called me.

17

Q.   So that was a continuous request of his, please get me some help?

A.   Yes

44.   On information and belief, from the first interview of Salgado in the fall of 2011, representatives of ICIB and the District Attorney's Office represented to Salgado, both directly and through his sister, Veronica Flores, that he may be eligible for relief from deportation through a U Visa application if he continues to cooperate with the prosecution against Plaintiffs, and that they would assist him in doing so. On information and belief, these representatives also made clear to Salgado, either directly or through his sister, that their assistance and promises of assistance with respect to a U Visa application should not be disclosed because it would look like they were seeking favor with a witness and giving benefits in exchange for testimony.

45.   On June 9, 2015, Plaintiff Lindsey testified in his own defense.  On June 11, 2015, after three hours of deliberation, the jury acquitted Plaintiffs of all charges.

### E.   POST TRIAL

46.   After the full acquittal on June 11, 2015, the LASD returned Plaintiffs to "Relieved of Duty with pay" status. Plaintiffs had been ordered by LASD to be without pay since April 2, 2013, the date of the filing of criminal charges.

47.   Regardless of the acquittal, Plaintiffs faced LASD termination proceedings for the purported misconduct. After a hearing before LASD Chief Denham and Commander Joe Gooden, the charge of Plaintiffs' false report writing was deemed "unresolved." In a settlement with the LASD, Plaintiffs were to resume their jobs and receive one year of back pay instead of the two and one half years in which they received no salary.

48.   On February 13, 2017, Plaintiffs returned to work in full duty capacity for the LASD.

**F.  CRIMINAL PROCEEDINGS AGAINST PLAINTIFFS WERE INITIATED BY THEN UNDERSHERIFF PAUL TANAKA**

49.  As of August of 2011, the date of Salgado's preliminary hearing, and the initiation of the ICIB investigation of Plaintiffs, then Los Angeles County Sheriff Leroy Baca, the principal elected official responsible for the selection, promotion, supervision, training, discipline and retention of LASD deputies, had delegated responsibility for these areas to Undersheriff Paul Tanaka. Specifically, Sheriff Baca delegated to Undersheriff Tanaka responsibility for overseeing the initiation of investigations and the referral for criminal prosecutions pertaining to LASD deputies through ICIB. On information and belief, the decision to pursue an ICIB criminal investigation of Plaintiffs was initiated by then Undersheriff Paul Tanaka, who was acting outside of the scope of his authority as Undersheriff. On information and belief, the motivation to pursue a criminal investigation against Plaintiffs stemmed from a personal grudge of LASD Undersheriff Paul Tanaka against Plaintiff Lindsey's father, retired LASD Commander Robert Lindsey.

50.  As referenced above at ¶38, on October 23, 2014, and consistent with this position, Defendant Stennis advised Plaintiff Lindsey's attorney that, although he did not want to refile criminal charges against Plaintiffs, he was instructed to do so based on LASD pressure on the District Attorney's Office. On information and belief, the pressure applied by LASD on the Los Angeles County District Attorney's Office was generated by then Undersheriff Paul Tanaka.

**a.  Undersheriff Tanaka's Animus Toward Plaintiff Lindsey**

51.  In 2002, then-Captain Robert Lindsey, the father of Plaintiff Lindsey, challenged then Chief Paul Tanaka's authority on multiple occasions, culminating in Robert Lindsey's refusal to fraudulently change answers of applicants on the LASD promotional Lieutenant's Exam. Essentially Robert Lindsey refused to cooperate with Tanaka's efforts to place his selected LASD deputies in the position of lieutenant where they did not merit this advancement based on their test scores.

As a result of this refusal, Tanaka reprimanded Robert Lindsey, telling him, using expletives and threatening language, that his career "was over" in the Sheriff's Department.

52.   After removing Robert Lindsey from the Lieutenant's Exam oversight, Tanaka retaliated against other sworn personnel within Robert Lindsey's command. For the next 9 years, Robert Lindsey suffered repeated reprimands and negative career ramifications at the hands of Defendant Tanaka.

53.   In 2005, Robert Lindsey's son, Plaintiff Lindsey, graduated from LASD Academy. Throughout the next six years, prior to the June 2, 2011 arrest at the Durango Bar in Huntington Park, then Undersheriff Tanaka – who had no independent relationship with Plaintiff Lindsey – repeatedly confronted Plaintiff Lindsey, and sarcastically asked Plaintiff Lindsey how his father, Commander Robert Lindsey, was doing. On information and belief, Undersheriff Tanaka specifically targeted Plaintiff Lindsey in order to have Plaintiff Lindsey pass the message to his father, Commander Robert Lindsey, that Tanaka's animosity toward him continued.

54.   In May of 2012, after the ICIB investigation of Plaintiffs was made public within LASD, Plaintiffs were on "desk duty" at the Century Station when the station captain, Joe Gooden, ordered Plaintiffs into his office. During that meeting, Captain Gooden advised Plaintiffs that Defendant Tanaka ordered him to send Plaintiffs "the fuck home."

**b.     The County's Historic Failure to Initiate Criminal Investigations or Impose Sanctions, including Referring Cases for Criminal Prosecution, Against Sheriff's Deputies  Corroborates Defendant Tanaka's Unconstitutional Motivation to Initiate Charges Against Plaintiffs**

55.   On information and belief, during the relevant time period, the Los Angeles County District Attorney's Office repeatedly failed to investigate and/or

20

to refer for prosecution deputy sheriffs accused of engaging in false and deceptive practices while in the line of duty. This failure to hold deputies accountable by referring cases for the filing of criminal charges stems from a political collaboration between the LASD and the District Attorney's office rather than any substantive decision about the strength of the evidence against a deputy sheriff, or the seriousness of the deputy's misconduct. This conduct has been highlighted in public reports as follows:

a.      When running for his third term in 2008, District Attorney Steve Cooley was "accused of going soft on bad cops." Cooley Makes Case for a Third Term, L.A. Times, May 18, 2008.

b.      In 2011 – after the Los Angeles County Citizen's Commission for Jail Violence had been formed based on reports of systematic beatings and cover-ups at the Los Angeles County Jails – the Los Angeles Times noted: "In several cases in recent years, deputies who were disciplined or even fired for abusing inmates escaped criminal scrutiny because Sheriff's Department officials chose not to give the evidence to the district attorney's office, opting to handle the cases internally." D.A. in the Dark on Jail Probes, L.A. Times, December 4, 2011.

c.      In September of 2013, the 33rd Semiannual Report of Special Counsel for the Los Angeles County Sheriff's Department was published. In that report, Special Counsel Merrick Bobb wrote: "there are far too many instances of the Department being lenient toward members who withheld or obscured the truth."

d.      By 2016, a pattern of excessive force at Los Angeles County jails prompted the resignation of Sheriff Baca. In his place, Sheriff McDonnell was elected as the Sheriff, focusing on a platform of "cleaning out" the Department of problem deputies. In that year, the Los Angeles Times investigated the systemic problem in the LASD where deputies

continued to receive their salary regardless of their use of false statements in police reports while on duty. Specifically, the Times noted:

- "McDonnell's tough approach [to sanction those deputies who wrote false reports] contrasts with that of former Sheriff Lee Baca, who let some proven liars off with remedial classes."

- "The number of deputies with documented histories of dishonesty could be in the dozens or hundreds and possibly includes some high-ranking supervisors, said Executive Officer Neal Tyler, McDonnell's top aide."

56.   The recent history of the LASD's lack of concern and transparent leniency toward deputies who write false police reports, juxtaposed with the specific characteristics of the referral for prosecution against Plaintiffs, supports Plaintiffs' information and belief that then Undersheriff Tanaka, acting outside of the scope of his authority as Undersheriff for the LASD, initiated this retaliatory action against Plaintiffs without any genuine or legitimate law enforcement purpose. Specifically, (a) the complaining witness Salgado's characteristics (without immigration status; used multiple false names; had multiple controlled substance offense convictions; and had a quarter gram of cocaine seized from his vehicle); (b) the make-up of the ICIB investigation – all deputies who are now convicted of federal felonies for pursuing illegal conduct of obstructing justice by hiding an FBI informant pursuant to then Undersheriff Tanaka's orders *during the same time period as the initiation of this investigation*; and (c) then Undersheriff Tanaka's personal and aggressive history with Robert Lindsey and intimidation of Plaintiff Lindsay, all supports Plaintiffs' information and belief.

## G.    PARTICIPATION, STATE OF MIND AND DAMAGES

57.   Each Defendant participated in the violations alleged herein, or directed

the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved or acquiesced in the violations alleged herein.

58.   As joint actors with joint obligations, each Defendant was and is responsible for the failures and omissions of the other.

59.   Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiffs' rights.

60.   Each Defendant acted with a deliberate indifference to or, reckless disregard for, Plaintiffs' rights and/or the truth.

61.   As a direct and proximate result of the aforesaid acts, omissions, and decisions of the Defendants, Plaintiffs have suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, apprehension, loss of earnings,  loss of financial stability, and expenditure of attorney fees for the defense of their criminal case, which have caused Plaintiffs to sustain damages in a sum to be determined at trial.

62.   The aforementioned acts of the Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiffs, entitling Plaintiffs to exemplary and punitive damages from each Defendant in an amount to be proven at the trial of this matter.

63.   By reason of the above described acts and omissions of Defendants, Plaintiffs were required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiffs that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988.

## **FIRST CLAIM FOR RELIEF**

### **DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983 – FOURTH AMENDMENT / DUE PROCESS / BRADY**
### **(Against Defendants Stennis and Does 1-10)**

64.   Plaintiffs reallege all the foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

65.   Defendant Stennis and Does 1-10, while acting under color of law as agents for the County of Los Angeles, deprived Plaintiffs of their civil rights under the Fourth, Fifth, and Fourteenth Amendments as follows. To the extent that any court were to conclude that the source of Plaintiffs' rights is any other constitutional source, this claim is brought on those bases as well.

     a.   Defendants seized and prosecuted Plaintiffs without a lawful warrant or probable cause to believe that they were involved in criminal activity.

     b.   Defendants negotiated benefits with witness Salgado while concealing those benefits, thereby depriving the defense and the court of material exculpatory evidence.

66.   Defendants Stennis and Does 1-10 understood the risks to Plaintiffs' rights, and/or acted with reckless disregard or deliberate indifference, when they prosecuted Plaintiffs without probable cause, misrepresented highly material exculpatory evidence, and concealed the promise of benefits to Salgado.

67.   Based on this unconstitutional conduct, Defendants Stennis and Does 1-10 caused Plaintiffs to face felony charges for an extensive period of approximately 26 months without probable cause.

68.   Defendant Stennis and the other Doe Defendants were each jointly and severally responsible for these constitutional violations. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to

prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

69.   The above acts and omissions, while carried out under the color of law, have no justification or excuse in law, and instead constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the court of protecting persons or property, or ensuring civil order.

70.   Plaintiffs have a right to be free from deprivation of their liberty without due process of law, as protected by the Fourteenth Amendment.  Plaintiffs have a liberty interest in being free from abusive governmental action and in being accorded procedural and substantive due process of law.  All of these rights and privileges are secured by plaintiffs by the provisions of the Due Process clause of the Fourteenth Amendment to the United States Constitution and by 42 U.S. §1983.  All of these interests were implicated by the wrongful conduct of the Defendants, which proximately caused the injuries and damages to Plaintiffs, as herein alleged.

71.   As a direct and proximate result of the foregoing, Plaintiffs sustained Injury and damage as hereinabove alleged.

## SECOND CLAIM FOR RELIEF

### DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. § 1983 - SELECTIVE PROSECUTION / EQUAL PROTECTION
### (Against Defendant Tanaka, and Does 1-10)

72.   Plaintiffs reallege all the foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

73.   Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, Defendant Tanaka and Does 1 - 10, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and

statutory rights of Plaintiffs, violated Plaintiffs' equal protection rights by selectively prosecuting them. Plaintiffs were referred for prosecution based on an impermissible and vindictive motive where other similarly situated officers accused of similar conduct were not referred for prosecution.

74.   The actions of Defendant Tanaka and Does 1-10, as set forth herein, violated Plaintiffs' equal protection rights under the United States Constitution.

75.   Based on this unconstitutional conduct, Defendants Tanaka and Does 1-10 caused Plaintiffs to face felony charges for an extensive period of approximately 26 months.

76.   Defendant Tanaka and the other Doe Defendants were each jointly and severally responsible for these constitutional violations. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

77.   The above acts and omissions, while carried out under the color of law, have no justification or excuse in law, and instead constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the court of protecting persons or property, or ensuring civil order.

78.   The actions of Defendant Tanaka and Does 1-10, set forth herein were a moving force behind the violations of Plaintiffs' constitutional rights as set forth in this complaint.

79.   As a direct and proximate result of Defendants actions, Plaintiffs sustained injury and damage as herein alleged.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, Robert G. Lindsey and Charles G. Rodriguez, requests relief on their own behalf as follows, and according to proof, against each Defendant:

1.     General and compensatory damages in an amount according to proof;

2.     Special damages in an amount according to proof;

3.     Exemplary and punitive damages against each Defendant, in an amount according to proof;

4.     A declaration that the acts and/or omissions of each Defendant violated Plaintiffs' rights under the United States Constitution;

5.     Costs of suit, including attorneys' fees, under 42 U.S.C. §1988 and whatever other provision of law may be applicable; and,

6.     Such other relief as may be warranted or as is just and proper.

Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT, LLP

DATED:   May 24, 2017          By: */s / Ronald Kaye*
                                      RONALD O. KAYE
                                      Attorneys for Plaintiffs
                                      ROBERT G. LINDSEY
                                      CHARLES G. RODRIGUEZ

27

## **<u>JURY DEMAND</u>**

Trial by jury of all issues is demanded.

KAYE, McLANE, BEDNARSKI & LITT, LLP

DATED:   May 24, 2017          By: */ s / Ronald Kaye*_____
RONALD O. KAYE
Attorneys for Plaintiffs
ROBERT G. LINDSEY
CHARLES G. RODRIGUEZ

28